IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
JUDGE WALKER D. MILLER

Civil Action No. 07-cv-00860-WDM-KLM

HARLAN WALTER ASHCRAFT, III,

    Plaintiff,

v.

JAMES L. BEICKER,
TY P. MARTIN, and
FREMONT COUNTY SHERIFF'S DEPARTMENT,

    Defendants.

## ORDER ON MOTION FOR SUMMARY JUDGMENT

Miller, J.

This matter is before me on the Motion for Summary Judgment (doc no 48) filed by Defendants Sheriff James L. Beicker (Sheriff Beicker), Undersheriff Ty P. Martin (Undersheriff Martin), and Fremont County Sheriff's Department (Fremont) (collectively Defendants). Plaintiff opposes the motion. After a review of the pleadings and the parties' written arguments, I conclude oral argument is not required. For the reasons that follow, the motion will be granted.

### Background

This action arises out of Plaintiff's employment as a deputy sheriff with Fremont. Plaintiff was employed by Fremont from 1999 until his termination in 2005. SueAnn Ashcraft, Plaintiff's wife, was also employed by Fremont until 2003. Prior to the termination of her employment with Fremont, Mrs. Ashcraft filed an employment discrimination lawsuit against Fremont alleging sexual harassment; the matter was

resolved in 2001.

In May 2005, after Mrs. Ashcraft was no longer employed by Fremont, Plaintiff accompanied Mrs. Ashcraft to a meeting with Undersheriff Martin at which time they complained that Sergeant Brian Webb (Sergeant Webb) was sexually harassing Mrs. Ashcraft by spreading false rumors while he was in uniform that Mrs. Ashcraft was sexually promiscuous with various local men. According to Undersheriff Martin, he investigated the claim by attempting to contact the persons who allegedly told Mrs. Ashcraft about Sergeant Webb's comments, using the contact information provided by Mrs. Ashcraft. Because the source was wanted on a warrant at the time, he did not return Undersheriff Martin's calls. Undersheriff Martin also interviewed Sergeant Webb and Webb's supervisor. Ultimately, Undersheriff Martin determined he could not corroborate the complaint[1] and no disciplinary charges were pursued against Sergeant Webb.

Plaintiff's employment was terminated in late September 2005 based on three reasons unrelated to the sexual harassment complaint: Plaintiff allegedly sleeping on the job, Plaintiff allegedly misusing official information, and Plaintiff's improper use of a stun device on an inmate and alleged attempts to falsify the reports concerning the incident. In this lawsuit, Plaintiff's single remaining claim is that Fremont violated his First Amendment rights by terminating his employment in retaliation for his involvement in his wife's complaint.

---

[1]Plaintiff purports to dispute this by offering hearsay evidence that the source of the information attempted to reach Webb's supervisor. Because such evidence is not proper evidence for the purposes of Rule 56, I consider this fact to be undisputed.

The undisputed facts show that around July or August 2005, approximately two to three months after the May 2005 meeting, Sergeant Michael Bowman, Plaintiff's supervisor, filed a report to Commander Kurt Hammel that he had observed Plaintiff sleeping on duty on four separate occasions. At Hammel's direction, Bowman obtained written statements from other deputies regarding their observations of Plaintiff sleeping on duty, which appear to have been submitted in mid-August 2005. It is undisputed that sleeping on duty without permission of a supervisor is a violation of the Sheriff's Office Policies and Procedures. Plaintiff never sought nor obtained permission to sleep on duty. At the time the parties were engaged in discovery, in 2007, another deputy was under investigation for sleeping on duty; the recommended discipline was a three-day suspension.

Around the same time, in July 2005, Sergeant Bowman observed Plaintiff reading a printout of a NCIC/CCIC (National Crime Information Center/Colorado Crime Information Center) criminal history report. Sergeant Bowman thought this unusual because at the time, there were no arrestees awaiting processing, which would be the usual reason for obtaining NCIC/CCIC reports. Sergeant Bowman saw that the report concerned Plaintiff's stepson, Jason Bickle. Bowman and the master control operator who pulled the report for Plaintiff submitted statements to Commander Hammel regarding Plaintiff's request for the NCIC/CCIC report. Commander Hammel interviewed Plaintiff regarding the report; Plaintiff admitted he had requested his stepson's criminal history report. Hammel informed Plaintiff that his actions violated Sheriff's Office policy which prohibits obtaining NCIC/CCIC information for personal use. It is undisputed that this is a serious infraction, as abuse of the NCIC/CCIC database

3

could result in the revocation of the Sheriff's Office's privileges to use the system, thus requiring the office to make such requests from other law enforcement agencies. One other employee was reported to have used the NCIC/CCIC database for personal purposes, instead of law enforcement purposes. She resigned before the investigation was completed.

The third justification for Plaintiff's termination also occurred around July 2005. Plaintiff and another deputy, Deputy Troy Hoss, were processing an intoxicated and uncooperative inmate. At some point, Plaintiff used an Ultron II hand held electronic stun device on the inmate; the incident was captured in a digital recording.[2] Plaintiff filed a use of force report that was reviewed by Undersheriff Martin and the Sheriff's Office Use of Force Review Board. The Board investigated and in a report dated August 11, 2005, determined that (1) Plaintiff had inappropriately used the stun device; (2) Plaintiff attempted to falsify his use of force report to justify the use of the device; and (3) Plaintiff attempted to influence Deputy Hoss into falsely reporting what he has observed. Inappropriate use of the Ultron II also violates the policies and procedures prohibiting use of force greater than what is reasonable and necessary to apprehend or subdue. The policies and procedures also prohibit making false reports and giving false testimony.

Undersheriff Martin and Commander Hammel met with Plaintiff to discuss these allegations on September 27, 2005. At the meeting, Plaintiff admitted that he dozed or nodded off on occasion while on duty, admitted that he had requested the criminal

---

[2]At the time, the Sheriff's Office did not have the ability to extract and save such recordings. The recording was automatically overwritten and is no longer available.

history report for his stepson but said he would not do it again, but disputed that he had inappropriately used the Ultron II. Undersheriff Martin terminated Plaintiff's employment either at that meeting or the next day. The termination was approved by Sheriff Beicker based on the information he received from Undersheriff Martin.

## Standard of Review

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. A factual issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying 'a lack of evidence for the nonmovant on an essential element of the nonmovant's claim.'" *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)). Then, "[t]o avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Id.*

## Discussion

A five part test is employed to determine whether a public employee's First Amendment rights were violated by an employer's adverse action: (1) the court must determine whether the employee speaks "pursuant to [his] official duties;" (2) if an employee does not speak pursuant to his official duties, but instead speaks as a citizen, the court must determine whether the subject of the speech is a matter of public

5

concern; if the speech is not a matter of public concern, then the speech is unprotected and the inquiry ends; (3) if the employee speaks as a citizen on a matter of public concern, the court must determine "whether the employee's interest in commenting on the issue outweighs the interest of the state as employer"; (4) assuming the employee's interest outweighs that of the employer, the employee must show that his speech was a "substantial factor or a motivating factor in [a] detrimental employment decision"; and (5) if the employee establishes that his speech was such a factor, "the employer may demonstrate that it would have taken the same action against the employee even in the absence of the protected speech." *Brammer-Hoelter v. Twin Peaks Charter Academy*, 492 F.3d 1192, 1203-4(10th Cir. 2007) (citations omitted). The first three steps are to be resolved by the district court, while the last two are ordinarily for the trier of fact. *See Cragg v. City of Osawatomie*, 143 F.3d 1343, 1346 (10th Cir.1998).

In my order (doc no 54) partially granting Defendants' Motion to Dismiss, I ruled that Mrs. Ashcraft's complaint could be speech concerning a matter of public concern, not within the scope of Plaintiff's official duties, and therefore could be protected by the First Amendment. In their motion for summary judgment, Defendants contend that even if the speech was protected, Plaintiff cannot demonstrate that his discharge was substantially motivated by that action. I agree.

To withstand summary judgment on the issue of substantial motivation, an employee must produce evidence linking the employer's action to the employee's speech. *Maestas v. Segura*, 416 F.3d 1182, 1188 (10th Cir. 2005) (citations omitted). "Speculation or hunches amidst rumor and innuendo will not suffice." *Id*. at 1189. Although adverse action in close proximity of protected speech may warrant an

6

inference of retaliatory motive, temporal proximity alone is insufficient to establish that the speech was a substantial motivating factor in the decision. *Id.* An employer's knowledge of the speech together with close temporal proximity may be sufficient to raise an issue of fact regarding causation. *Id.* Other evidence of causation may include evidence that the employer expressed opposition to the employee's speech or evidence the speech implicated the employer in serious misconduct or wrongdoing. *Id.*

     I agree with Defendants that even if Plaintiff's speech were protected, no reasonable jury could find that Mrs. Ashcraft's complaint about Sergeant Webb was a substantial motivating factor in the decision to terminate Plaintiff's employment. First, several of the reports of Plaintiff's misconduct (sleeping and misuse of the NCIC/CCIC system) were initiated by Sergeant Bowman. There is no evidence that Bowman was aware of Mrs. Ashcraft's complaint[3] or of Plaintiff's connection to it. He also denied being told to watch or to investigate Plaintiff and Plaintiff has offered no evidence that Undersheriff Martin issued any such directions. Similarly, although Undersheriff Martin was involved in the use of force investigation, the Board was comprised of three officers who reviewed the video, interviewed Plaintiff and Deputy Hoss, and determined that Plaintiff's use of the stun device was unwarranted. Again, Plaintiff has presented no evidence that the members of the Use of Force Board were aware of the sexual harassment complaint by Plaintiff's wife. In addition, the temporal nexus is tenuous.

---

[3] Indeed, I question whether the complaint can really be considered "speech" by Plaintiff, as the undisputed testimony is that Mrs. Ashcraft was the primary speaker and complainant, with Plaintiff's role being only as support. However, since Plaintiff's complaint also concerns his First Amendment right to free association, I need not resolve this issue.

The reports of misconduct were filed two to three months after the complaint and the termination decision was even later. *See Anderson v. Coors Brewing Co.,* 181 F.3d 1171, 1179 (10th Cir. 1999) (in employment discrimination/retaliation context, three month interval between protected activity and adverse action, standing alone, is insufficient to show causation)

Plaintiff's primary arguments in response appear to be aimed at demonstrating that the reasons for his termination were pretextual. He contends that the misconduct did not merit dismissal, that other employees had done the same conduct, or offers justification for his action. None of Plaintiff's arguments, however, are sufficient to demonstrate that the Defendants did not act in good faith.

First, Plaintiff argues that he only admitted to dozing off and that other deputies slept on occasion too. However, Plaintiff has no evidence that any reports or complaints were filed about other employees sleeping; accordingly, Plaintiff cannot show that he was treated differently because of his wife's complaint.[4] In addition, Plaintiff does not dispute that Undersheriff Martin received reports from four different employees describing Plaintiff sleeping with his legs up on the desk, with a jacket pulled up to his neck, and failing to wake up even after the deputies set off alarms or otherwise made noise that should have awakened him. No reasonable jury could find that Undersheriff Martin's decision to give credence to those reports, in light of Plaintiff's admission, was in bad faith or a pretextual justification for retaliation.

---

[4]Plaintiff asserts that the one other employee disciplined for sleeping has not been terminated. However, even if this alone might suggest pretext, there are other distinct incidents of misconduct justifying termination.

Second, Plaintiff argues that his use of the NCIC/CCIC database was for law enforcement purposes because there was a possibility his stepson would be moving into his home and might have an outstanding warrant or felonies. Plaintiff asserts this was a concern because as a law enforcement officer he should not be living with a person convicted of a felony and/or was obligated to ensure the arrest of someone with an outstanding warrant. The problem with this argument is that there is no evidence that Plaintiff informed Undersheriff Martin of the possibility that the stepson would be moving in. Rather, the evidence Undersheriff Martin received was essentially that Plaintiff had been curious about his stepson's criminal record. Moreover, Undersheriff Martin testified in his deposition that if Plaintiff was concerned about his stepson's warrants, the proper procedure would have been to notify a patrol officer with arrest authority [Plaintiff worked in the detention facility] to investigate and make an arrest if appropriate. Similarly, Plaintiff points to some inconsistencies in the reports of how Plaintiff requested the information from the master control officer; again, since Plaintiff admitted making the request, these discrepancies are immaterial. Finally, Plaintiff again tries to demonstrate pretext by arguing that others were not discharged for the same conduct[5]. He concedes, however, that these individuals were not caught. Exh. 1 to Plaintiff's Response (doc no 49-2) at 125. The only person whose conduct was reported resigned before termination could occur; accordingly, Plaintiff has offered no evidence of truly similarly situated employees who were treated differently by the same

---

[5]Plaintiff also appears to argue that the Sheriff's Office used the NCIC/CCIC computer for other purposes, such as providing criminal reports to persons bonding out arrestees and for background checks for new hires. Since all of these purposes are related to law enforcement, I see no inconsistency.

decisionmaker.  Given the seriousness of the infraction, and the persuasive evidence before Undersheriff Martin that Plaintiff's use of the database was for personal reasons, I again conclude that no reasonable jury could find that this justification for the termination was pretextual.

Plaintiff's final arguments relate to the Board's finding, and Undersheriff Martin's concurrence, that Plaintiff's use of the stun gun was improper and that Plaintiff had attempted to alter reports to make it appear that his use of force was justified.  Plaintiff argues that the evidence could be interpreted to find that his use of force was justified.  Plaintiff also asserts that although he did suggest that Deputy Hoss change his report, the change was not material, as it had to do with where the device was placed and/or an aggressive posture the inmate had taken at another time during the incident.

According to the undisputed testimony of Undersheriff Martin, shortly after the event, Deputy Hoss approached him and said that Plaintiff had tried to get him to write his report to be consistent with Plaintiff's.  Martin told Hoss to write a supplemental report to correct any inaccuracies.  As part of the investigation, Deputy Hoss also gave a written statement regarding the change Plaintiff allegedly asked him to make.

Plaintiff's report stated that the inmate "was standing with his fists balled up in an aggressive manner, also started to step towards Officer Davis & Sgt Hill.  Subject refused to take off his shoes at this time, still being belligerent and cussing.  Subject was given this order several times and refused.  At this time I placed the Ulton [sic] II against his left upper leg ... and again instructed him to take off his shoes subject again refused to take off the shoes and was still very belligerent.  At this time I pushed the power button on the Ultron II and held it on his leg for about 2-3 seconds."  Exh. 4 to

Plaintiff's Response (doc no 49-5). Deputy Hoss's statement was that Plaintiff said that "I should insert that [the subject] had taken a fighting stance and advanced towards officers at a certain time during the incident. I agreed that he had taken an aggressive posture but at a different time during the incident." *Id.* It is undisputed that the inmate was seated at the time Plaintiff used the Ultron II. The Use of Force Review Board determined that at the time the stun device was used, the inmate was refusing to comply with commands but not attempting to physically prevent or defeat the deputy's commands, actions which could justify the use of the stun device. Exh. A-6 to Defendants' Brief (doc no 48-7). The inmate was 4'11" and 110 pounds, was in a cell with two officers with two other officers outside of the holding cell, and had done no more than verbally refuse commands. *Id.* Accordingly, the Board concluded that a lower level of force was appropriate and that Plaintiff had used the stun device "maliciously as a means of punishment for disobeying the order." *Id.* The Board also concluded that Plaintiff had attempted to influence Deputy Hoss into changing his report to make it appear that the inmate had been more aggressive before the use of the stun device. *Id.*

    I agree with Plaintiff that the reports of Deputy Hoss and Plaintiff were similar except for a disagreement over when the inmate stepped toward them; however, this does not give rise to an inference that Undersheriff Martin's decision to give weight to the Review Board's findings was unfounded or in bad faith. Again, there is no evidence that the Review Board knew of Plaintiff's complaint about Sergeant Webb. The Board had a strong basis to find that Plaintiff's use of force was unjustified, taking into account the number of officers, the inmate's small stature, and the inmate's seated position.

Plaintiff argues the inmate raised his foot to have the deputies take off his boots, which could indicate aggression. However, Plaintiff offers no evidence that the inmate was kicking the deputies or otherwise physically aggressive. Even in his deposition, Plaintiff does not describe any physical acts impeding the deputies: "[The inmate] would lean forward like he was going to start cooperating. Then he would lean back with his fists balled up, sitting on the seat. Wouldn't take his boots off. Kept moving around like he was going to get up. At that point I believe is where I hit him." Exh. 1 to Plaintiff's Response (doc no 49-2) at 77. Plaintiff's mere assertion that his use of the stun device was appropriate, given the written policies on the use of force and the conclusions of the Use of Force Review Board, are insufficient to create an issue of fact in this regard.

Similarly, there was ample evidence for the Board to find that Plaintiff had attempted to influence Deputy Hoss to change his report, including the written statement by Hoss and his assertion to Undersheriff Martin that he was not comfortable with the initial report he had submitted at the direction of Plaintiff.

Finally, Plaintiff points to various statements by decisionmakers that indicate that any one of these infractions, alone, might not be sufficient grounds for a discharge. However, Plaintiff's conduct involved several serious incidents in close proximity. In addition, despite Plaintiff's highlighting of some small inconsistencies, it appears that the reports of Plaintiff's misconduct had a strong factual basis; indeed, Plaintiff admitted most of the allegations. Under these circumstances, Plaintiff has not presented facts sufficient to give rise to a genuine issue as to whether the reasons given for his

discharge were pretextual and that the substantial motivating factor was actually his association with his wife's complaint about Sergeant Webb.

Accordingly, it is ordered:

1. Defendants' Motion for Summary Judgment is granted. Judgment shall enter in favor of Defendants and against Plaintiff as a matter of law.

2. Defendants may have their costs.

DATED at Denver, Colorado, on July 9, 2008.

BY THE COURT:


s/ Walker D. Miller
United States District Judge